NO. 24-3876

# IN THE

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

———————

## DANIEL GRAND,

*Plaintiff/Appellant,*

v.

## CITY OF UNIVERSITY HEIGHTS, MICHAEL BRENNAN, LUKE MCCONVILLE, and PAUL SIEMBORSKI

*Defendant/Appellees.*

———————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OHIO THE HONORABLE MEGAN BRENNAN, PRESIDING NO. 1:22-cv-1594

———————

## OPENING BRIEF OF PLAINTIFF-APPELLANT DANIEL GRAND

———————

Eden Quainton, *admission pending*
Quainton Law, PLLC
2 Park Avenue, 20th Floor
New York, NY 10016
(212) 419-0575
eden.quainton@quaintonlaw.net
*Counsel for Plaintiff-Appellant*

Jonathan Gross, *admitted*
Law Office of Jonathan Gross
2833 Smith Ave., Suite 331
Baltimore, MD 21209
(443) 413-0141
jonathansgross@gmail.com
*Counsel for Plaintiff-Appellant*

**Oral Argument Requested**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the Federal Rules of Appellate Procedure and Sixth Circuit Rule 26.1, Plaintiff-Appellant Daniel Grand certifies that he is not a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation that is not a party to this appeal has a financial interest in its outcome.

/s/ Jonathan Gross

Counsel for Daniel Grand

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Because of the nature of the facts and law at issue, Plaintiff believes that the Court will benefit from oral argument.

# **TABLE OF CONTENTS**

DISCLOSURE OF CORPORATE AFFILIATIONS……………….…….……..……i

STATEMENT IN SUPPORT OF ORAL ARGUMENT………….…..……...……i

TABLE OF AUTHORITIES……………………………………………….…iv

INTRODUCTION…..…………………………………………………………1

STATEMENT OF JURISDICTION…..………………………………………....4

STATEMENT OF ISSUES…..………………………………………………....4

STATEMENT OF THE CASE………..……………………………………….5

      I.     FACTUAL BACKGROUND………………………………………....5

          A. The City, Brennan and McConville Preemptively Issue a Cease and Desist Order……………..…………………………5

          B. Grand Cancels His Prayer Gathering and Applies for a SUP as Directed………………………………………….......10

          C. Grand is Subjected to An Unprecedented Quasi-Judicial Hearing………………………………………………….13

          D. Community Anti-Semitism…………………………………..15

          E. Grand is Denied an Opportunity to Supplement his Application………………………………………….......16

          F. At the Second PC Meeting, the City Barred Any Activities "Consistent" with Those of a House of Worship in Private Homes………………………………………….....19

      II.    PROCEDURAL HISTORY.......................................…..22

ARGUMENT SUMMARY….………………………………………....23

ARGUMENT….………………………………………………….……24

      I.     The District Court Wrongly Applied the "Ripeness" Doctrine and the Related Concept of "Finality"……………………….....25

          A. The Issuance of the Cease-and-Desist Order in the Absence of a Suspensive Appeals Process and Other Safeguards to Protect Core First Amendment Rights Causes Direct, Immediate Harm and Is Immediately Ripe for Judicial Review……………………………..………………........25

              1. The Lack of a Suspensive Appeals Process…………..25

2. The Lack of Additional Safeguards………..….……..28

B. The Alleged Violations of Procedural Due Process in the Conduct of the PC Hearing Are Immediately Ripe for Review……………………………………………...….…30

C. Brennan's March 23 Edict Was Clearly Unconstitutional……..33

D. Grand Discrimination Claims Come Within the Futility Exception to the Ripeness Doctrine………………………….34

II. The District Court Wrongly Ignored Grand's Facial Challenges to the City's Ordinances…………………………...……..37

A. Grand Stated and Argued Facial Challenges…………………37

B. Grand's Facial Challenges are Ripe…………………………39

C. The Parties Never Agreed that the Ordinance Does Not Apply…………………………………………………………46

III. The District Court Wrongly Dismissed Grand's claims with Prejudice Sua Sponte Without Notice or a Chance to Be Heard…………………………………………………...……49

IV. The District Court Wrongly Dismissed Plaintiff's Fourth Amendment and FACE Act Claims……………………………..50

A. Fourth Amendment……………………………………………50

B. FACE ACT…………………………………………………51

V. The District Court Should Exercise Supplemental Jurisdiction Over Plaintiff's Ohio Public Records Act Claims…………...……53

CONCLUSION….……………………………………………………53

CERTIFICATE OF COMPLIANCE….……………………………….…...54

CERTIFICATE OF SERVICE….……………………………………….54

APPELLANTS DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS……...………………………………………………54

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Allen v. Keanen*,
　No. 13-CV-718, 2019 WL 1486679 (W.D.N.Y. Apr. 4, 2019) ...................39

*AM Rodriguez Assocs., Inc. v. City Council of Vill. of Douglas*,
　No. 1:08-CV-214, 2009 WL 4353684 (W.D.Mich. Nov. 30, 2009)............34

*Amy Lou G., v. Commissioner of Social Security,*
　2025 WL 606459 (S.D. Ohio, Feb. 25, 2025) ...............................................51

*Arbaugh v. Y & H Corp.*,
　546 U.S. 500 (2006)...................................................................................54

*Benson v. O'Brian*,
　179 F.3d 1014 (6th Cir.1999) ...................................................................54

*Bigelow v. Michigan Dep't of Nat. Res.*,
　970 F.2d 154 (6th Cir.1992) .....................................................................32

*BMG Monroe I, LLC v. Vill. of Monroe*,
　93 F.4th 595 (2d Cir.2024) .......................................................................39

*Carpenter v. Bowling*,
　276 F. App'x 423 (6th Cir.2008) ...............................................................56

*Church of Lukumi Babalu Aye Inc. v. City of Hialeah*,
　508 U.S. 520 (1993)...................................................................................47

*City of Lakewood v. Plain Dealer Publ'g Co.*,
　486 U.S. 750 (1988)...................................................................................25

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
　915 F. Supp. 2d 574 (S.D.N.Y.2013) ........................................................42

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*,
　274 F.3d 377 (6th Cir.2001) ......................................................................42

*Elrod v. Burns*,
　427 U.S. 347 (1976)...................................................................................28

*Employment Division, Department of Human Resources of Oregon v. Smith*,
　494 U.S. 872 (1990)...................................................................................47

*Fulton v. City of Philadelphia*,
　593 U.S. 522 (2021)............................................................................ 47, 48

*FW/PBS, Inc. v. City of Dallas*,
　493 U.S. 215 (1990)...................................................................................45

*Grayned v. City of Rockford*,
　408 U.S. 104 (1972)...................................................................................44

*Hill v. Snyder,*
    878 F.3d 193 (6th Cir.2017) ............................................................. 42, 43, 44
*Hunter v. Mendoza,*
    197 F. Supp. 2d 964 (N.D. Ohio 2002) ...........................................58
*Insomnia Inc. v. City of Memphis, Tennessee,*
    278 F. App'x 609 (6th Cir.2008) ................................................27
*JGA Dev., LLC v. Charter Twp. of Fenton,*
    No. CIV. 05-70984, 2006 WL 618881 (E.D.Mich. Mar. 9, 2006) ..............35
*Jingrong v. Chinese Anti-Cult World All. Inc.,*
    16 F.4th 47 (2d Cir.2021) ...................................................... 56, 57
*Knick v. Twp. of Scott, Pennsylvania,*
    588 U.S. 180 (2019).......................................................... 27, 43, 44
*Miles Christi Religious Ord. v. Twp. of Northville,*
    629 F.3d 533 (6th Cir.2010) .............................................. passim
*Murphy v. New Milford Zoning Comm'n,*
    402 F.3d 342 (2d Cir.2005) ................................................. 29, 30, 55
*Nasierowski Bros. Inv. Co. v. City of Sterling Heights,*
    949 F.2d 890 (6th Cir. 1991) ................................................. 32, 34
*National Socialist Party of America v. Village of Skokie,*
    432 U.S. 43 (1977).............................................................26
*Norman v. United States,*
    38 Fed. Cl. 417 (1997).......................................................40
*Oliver v. Reynolds,*
    No. 5:06-CV-1-R, 2007 WL 2155688 (W.D.Ky. July 25, 2007)................56
*Payne v. Bobbie Brooks, Inc.,*
    505 F. Supp. 707 (N.D. Ohio 1980) ...........................................39
*Pestrak v. Ohio Elections Comm'n,*
    926 F.2d 573 (6th Cir.1991) ..................................................26
*Suitum v. Tahoe Reg'l Planning Agency,*
    520 U.S. 725 (1997).........................................................42
*Teamsters v. United States,*
    431 U.S. 324 (1977)....................................................... 38, 39
*United States v. Hollern,*
    366 F. App'x 609 (6th Cir.2010) .............................................55
*Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,*
    473 U.S. 172 (1985)....................................................... 27, 28
*Withrow v. Larkin,*

v

421 U.S. 35 (1975)..........................................................................................34

*Yetto v. City of Jackson*,
     No. 117CV01205STAJAY, 2019 WL 2715545 (W.D.Tenn. June 28, 2019)
     ................................................................................. 30, 31, 52, 53

## Statutes and Ordinances

18 U.S.C. § 248 ......................................................................... passim
28 U.S.C. § 1295 ...............................................................................4
28 U.S.C. § 1331 ...............................................................................4
28 U.S.C. § 1367 ...............................................................................4
42 U.S.C. § 1983 ....................................................................... 4, 43
42 U.S.C. § 2000cc ................................................................. passim
Ohio Code § 149.43 ................................................................. passim
University Heights Codified Ordinance Chapter 1274................................... passim

## Constitutional Amendments

U.S. Const. amend I ................................................................. passim
U.S. Const. amend IV ............................................................. passim
U.S. Const. amend XIV ........................................................... passim

## Other

https://www.youtube.com/watch?v=5Pl0YbrbZek&t=278s ...................................19
https://www.youtube.com/watch?v=D5kP12aBUUY ............................................13

## **INTRODUCTION**

Daniel Grand ("Grand") is a resident of the City of University Heights, Ohio ("City"). On January 19, 2021, he sent a private email to twelve people inviting them to assemble for prayer in his home on January 22 and 23. On January 20, the City Mayor Michael Brennan ("Brennan") and the City Law Director Luke McConville ("McConville") learned of Grand's intention and immediately sent him a cease-and-desist order ("CADO"), asserting that his intended prayer gathering violated University Heights Codified Ordinance Chapter 1274 ("UHCO 1274" or the "Ordinance").

Grand spoke to Brennan immediately after the letter was sent and insisted that all he wanted was to have a small informal prayer gathering in his home on the Sabbath and certain Jewish holidays. Brennan responded that, pursuant to UHCO 1274, Grand was forbidden from hosting even the small prayer gathering he proposed. According to Brennan, before he could host a small prayer group as intended, Grand had to first apply for a Special Use Permit ("SUP"), pay a fee, wait several weeks, and attend an adversarial quasi-judicial hearing. At the hearing, the burden would be on Grand to prove that his intention was to host an informal prayer group and not convert his home into a formal house of worship.

Brennan refused to listen to Grand's explanation of his intentions. Instead, he insisted that language in Grand's invitation, which referred to the prayer group as a

1

"shul" and ironically called the single room in which the prayer group would meet a Beis HaKnesset (a "house of assembly" in Hebrew), created an obligation to obtain a SUP before any form of prayer gathering could meet.

Brennan did not indicate whether an appeal process was available that would suspend the operation of the CADO until the City Planning Commission ("PC") had rendered a decision on the ostensibly required SUP. Nor did Brennan state whether the gathering of a limited number of individuals (10, 15, 20 or 25) was permissible without a SUP. Brennan made clear that the City prohibited, with immediate effect, _any_ prayer gathering in Grand's home before Grand had obtained a SUP.

The City, Brennan and McConville (collectively "Defendants")[1] conducted the SUP evaluation as a quasi-judicial hearing in a manner that had never before been used for any SUP applicant, including by preventing Grand from submitting evidence and depriving him of an opportunity to supplement his application, an opportunity routinely provided to SUP applicants. The proceeding itself was laced with antisemitism that Defendants tolerated, and even condoned.

Realizing the futility of proceeding with the SUP process, Grand withdrew his application and then filed the lawsuit giving rise to the present appeal. Grand's complaint challenged UHCO 1274, facially and as applied, under the First

---

[1] For efficiency, Plaintiff does not appeal the dismissal of claims against Paul Siemborski.

2

Amendment, the Equal Protection clause of the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA). Grand also claimed violations of the Ohio Public Records Act, the Freedom of Access to Clinic Entrances ("FACE") Act, the Fourth Amendment and procedural due process. In the course of the litigation, Grand amended his complaint twice and the operative pleading is now a Second Amended Complaint (the "SAC").

The District Court *sua sponte* dismissed with prejudice Grand's First Amendment, Equal Protection and RLUIPA claims for lack of jurisdiction based on the doctrine of ripeness. In doing so, the District Court committed clear error in (1) misapplying the ripeness doctrine, (2) failing to address Grand's facial challenges and (3) dismissing Grand's claims with prejudice without first providing him notice or an opportunity to be heard. The District Court also granted summary judgment in Defendants' favor with respect to Grand's Fourth Amendment and Face Act claims, committing clear error in deciding the fact issue of consent as a matter of law and holding that the FACE Act only applies to "places," such as residences and entire structures, and not to "spaces" such as a specially dedicated room within a larger structure.

For the reasons set forth below, this Court should vacate the District Court's order, and hold (1) Brennan's conduct violated Grand's First Amendment rights, (2) UHCO 1274 is void on its face, or, in the alternative, requires further fact-finding,

(3) Grand's procedural due process claims were ripe and should not have been dismissed, (4) Grand's Fourth Amendment and FACE Act claims should proceed to trial, and (5) the District Court should exercise supplemental jurisdiction over Grand's Ohio Public Records Act claim.

## STATEMENT OF JURISDICTION

The District Court had federal-question jurisdiction under 28 U.S.C. § 1331, premised on Grand's claims of violations of Constitutional rights and his request for relief under 42 U.S.C. § 1983. Second Amended Complaint, R-69 ("SAC") PageID# 576-77. The district court also had jurisdiction over state-law claims under 28 U.S.C. § 1367. *Id.* This Court has jurisdiction over this appeal under 28 U.S.C. § 1295. The Order from which this appeal is taken was entered on October 1, 2024. Amended Memorandum Opinion and Order. R-95 ("Order") PageID# 2805-41. The Order dismissed Counts I-III and V-XII for lack of subject matter jurisdiction; granted summary judgment to the Defendants for Counts IV, XIII and XV-XX; and declined supplemental jurisdiction for Count XIV. Order, PageID# 2841. Judgement was entered on October 1, 2024, R-96, and Grand timely filed his notice of appeal on October 8, 2024, R-97.

## STATEMENT OF ISSUES

1. Did the District Court err in applying the ripeness doctrine to dismiss Counts I-III and V-XII when the facts show that Grand suffered a direct and immediate injury as a result of the Defendants' conduct?

4

2. Did the District Court err in dismissing Grand's facial challenges to the City's Ordinance (Counts I-III and VIII-XII)?

3. Did the District Court err in dismissing Counts I-III and V-XII *sua sponte* with prejudice without notice to or briefing from either party?

4. Did the District Court err in entering summary judgment against Grand on his Fourth Amendment claims (Count IV) when there were questions of fact surrounding the issue of consent?

5. Did the District Court err in concluding that the FACE Act only applied to entire "places," such as homes or complete structures, and not to "spaces" within structures, such as Grand's proposed prayer room, and dismissing Count XVI of the SAC?

6. Should the District Court exercise supplemental jurisdiction over Plaintiff's Ohio Public Records Act claims on remand?

## <u>STATEMENT OF THE CASE</u>

### I.    FACTUAL BACKGROUND

A. <u>The City, Brennan And McConville Preemptively Issue a Cease and Desist Order.</u>

On January 21, 2021, Brennan and McConville received a facebook message from a resident named Ben Feldman. Appendix of Exhibits for Motion for Summary Judgment (hereinafter "MSJ-Appx."), Exhibit 3, R-82-1 PageID# 1553; Exhibit 4, R-82-1 ("Brennan Tr.") PageID# 1561, 1584-85; Exhibit 5, R-82-1 PageID# 1626-

29. Feldman informed Brennan that he had that day received a message on "our Groveland Chat about someone opening a synagogue in their house on Miramar [Blvd.]," and another resident doing the same on Churchill Rd. *Id.* PageID# 1533. Feldman was upset because these "makeshift synagogues upset the people who live on the blocks, [and] they also hurt the official synagogues on Green Rd. and Cedar." *Id.* Feldman further complained that "there are already a number of these pop-up synagogues in the neighborhood, one on my own block on Groveland." *Id.*[2] Feldman attached the message he referenced, an invitation from Grand. *Id.* Exhibit 1, R-82-1 ("Grand Decl. Jan 26, 2024") PageID# 1546. The invitation read:

> You are cordially invited to join us this Shabbos for the inauguration of the Shomayah Tefillah Beis Hakeneset located at 2343 Miramar Blvd. (The Daniel J. Grand Residence). We would like to take this opportunity to introduce to you our Rabbi – Rabbi Rosskam – a smicha recipient from Rabbi Rueven Feinstein, and Rabbi Heinemann from Star-K. Davening Times will be:
>
> | Friday Erev Shabbos Mincha | 5:20 p.m. |
> | Shabbos Shacharis followed by Kiddush | 9:45 a.m. |
> | Mincha Followed by Seudah Shlishit | 5:00 p.m. |
>
> You will see the shul entrance – keep a look out for the Orange Windows – and please spread the word to whomever you feel might be interested in coming.
>
> The shul is being put together for two reasons, one has always been to expand the community, so we can spread out and open up more houses on the other side of Belvoir, and the other is to have a place where people come to really, seriously daven to Hashem – we want to have a

---

[2] The record does not indicate whether a CADO was issued to the Groveland "pop-up synagogue."

place that doesn't have talking during the davening, a powerful place to have your prays heard and answered Bezrat Hashem. . .

Finally, if you are interested in joining us for some or all of the minyanim, please let us know, it will be super helpful, we're pushing hard to make sure we have a minyan [of ten people] right from the start so please come and also please consider bring someone with you.

*Id.*

A "shul" can refer to a synagogue, but also to a small place for prayer, such as the "shul" in a room at Yankee stadium, or in a law firms for prayer by Jewish attorneys. Gand Decl. March 8, 2024, R-91-1 PageID# 2610-28. The email made clear that it would be difficult to attract 10 people for a minyan. The grandiose language referencing the "inauguration of the "Shomayah Tefillah Beis Hakeneset" was tongue-in-cheek that the recipients of the message, who knew the difficulties Jews faced in attracting a minyan of ten people for prayer at a new location, clearly understood. MSJ-Appx, Exhibit 12, R-82-1 ("Meeting Tr.") PageID# 1684, 1714; Rosskamm Decl., R-91-3 PageID# 2630-31. Based only on the message from Feldman and without any investigation into the meaning of the words shul, HaKnesset, or minyan, Defendants immediately sent the CADO. Brennan Tr. PageID# 1583-85, 1588; MSJ-Appx. Exhibit 6, R-82-1 ("CADO") PageID# 1630-34.

The CADO informed Grand that (1) the City was aware of Grand's intention to use his home as "a place of religious assembly and in operation of a shul;" (2) operating a "shul" was  prohibited under the City's ordinance, UHCO 1274; (3) "to

the extent that the Premises are currently being used for said purposes or are intended to be used for such purposes in the immediate or near future, the City hereby demands that [Grand] immediately cease and desist any and all such operations;" (4) any use of his house as a place of religious assembly "may result in building code citations against [Grand] and in the pursuit of additional remedies;" (5) the City was exploring whether variances previously granted to Grand may be voidable "based upon subsequent illegal use of the Premises, or due to material omissions during the hearing process relating to your intent to utilize the Premises as a place of religious assembly;" and (6) if Grand desired to assemble for prayer in his home he "may make application to the City's Planning Commission for a Special Use Permit." *Id.* PageID# 1630-34. The CADO did not indicate whether an appeal process existed to suspend the operation of the letter until a hearing on a SUP, or whether there were any uses of Grand's prayer room, such as by a numerically limited number of individuals, that would not require a SUP.

Brennan "acted quickly" and called Grand that day to prevent the scheduled prayer assemblies. Brennan Tr. PageID# 1579, 1588. On the phone, Grand described his plans to Brennan as "just trying to get some people together at his house to pray." *Id.* PageID# 1589. Grand attempted to explain it would be absurd to convert his home to a synagogue and that his house would not be open to the public. Grand Decl. March 8, 2024, R-91-1 PageID# 1610-11. Brennan did not find Grand "credible"

8

and believed instead that Grand was "open[ing] a synagogue without a permit," because the invitation appeared to "invite the community to come over to the opening of the synagogue, to come meet the rabbi and be part of an ongoing concern with regular weekly services." Brennan Tr. PageID# 1589-90. Brennan did not know at the time how many people had received the invitation, nor did he ask Grand how many people it was sent to. *Id.* PageID# 1590-91, 1615. He made no attempt to contact the rabbi mentioned in the invitation. *Id.* PageID# 1581-82. He later admitted that he knew "shul" could mean anything from a small "informal group" of 10 people to a "full-blown synagogue" of 200 people. *Id.* PageID# 1602.

In his conversation with Grand, Brennan did not tell Grand "that if Grand kept the prayer on Shabbos to a small group of people, he would not need a Special Use Permit." *Id.* PageID# 1596. "Mr. Feldman's comments and Mr. Grand's invitation" provided a sufficient basis to issue Grand the CADO prohibiting Grand from hosting a "shul" in his home, and that Grand could not host a "shul" until he applied for a SUP. *Id.* PageID# 1598. Brennan told Grand that Grand could not have friends gather to pray in his home under any circumstances without a SUP. Grand Decl. March 8, 2024, R-91-3 PageID# 2612.

UHCO 1274 prohibits the operation of "houses of worship or religious education, including churches, temples, synagogues, religious organizations, parish houses, and parochial schools" without a SUP. MSJ-Appx., Exhibit 32, R-82-1

("UHCO 1274" or the "Ordinance") PageID# 1781-87. No definitions are provided for the enumerated religious uses. *Id.* An applicant for a SUP must first obtain the recommendation of the Planning Commission ("PC") and then approval of a majority of City Council. *Id.* PageID# 1782. The religious uses are only permitted on six streets, and the street where Grand lives, Miramar, is not one of them. *Id.* PageID# 1784. SUPs for the religious uses may not be granted without multiple variances for buildings that were not originally designed to be houses of worship, residences converted to houses of worship, andpecia properties that include "sleeping or residential use accommodations on any part of the site." *Id.* To obtain a variance, an applicant must appear before two public hearings, one before the PC and one before the City Council, and persuade both that the intended house of worship will provide a "clear benefit to the community and that denial will result in an unnecessary hardship to the applicant." *Id.*

B. <u>Grand Cancels His Prayer Gathering and Applies for a SUP As Directed.</u>

On January 21, a few hours after the call from Brennan, Grand sent an email, copying Brennan, informing his friends that the scheduled "prayer group" was canceled and that he was directed by the City to apply for a SUP. MSJ-Appx. Exhibit 2, R-82-1 PageID# 1551. Brennan forwarded the email to McConville but did not respond to Grand. *Id.* Neither Brennan nor McConville gave any indication that Grand's intended use of his prayer room to provide a space for a gathering of ten

Jews to constitute a minyan would not require a SUP. A few hours later, Grand emailed the City clerk that he intended to submit an application and a fee for a SUP "to have friends come and pray at my house" and that he hoped to be heard at the next PC meeting. MSJ-Appx. Exhibit 7, R-82-1 PageID# 1636. The clerk did not indicate that no SUP was necessary for a small prayer group in a single room in a home.

The next morning, January 22, Brennan received an email with Grand's SUP application. MSJ-Appx. Exhibit 8, R-82-1 PageID# 1637-40. The Application stated that Grand intended to "utilize my current recreation room for periodic religious gatherings." *Id.* PageID# 1638. He indicated that there would be no traffic or parking issues because the assemblies would be on the Sabbath and certain Jewish holidays and the invitees – all Sabbath-observing Orthodox Jews – are not permitted to drive on the Sabbath or the holidays in question. *Id.*; Grand Decl. PageID# 1546-47; Brennan Tr. PageID# 1572; Rosskam Declaration, R-91-3 PageID# 2630. Grand included a sketch of the ground floor of his home and a photograph of the room where he and other Jews would gather for prayer. *Id.* PageID# 1639-40.

A meeting was scheduled for the PC to hear Grand's Application for March 4, 2021. MSJ-Appx. Exhibit 9, R-82-1 PageID# 1642. Prior to the meeting, Brennan and the PC received a "Letter of Clarity" that Grand submitted to the PC and personally delivered to his neighbors. MSJ-Appx. Exhibit 15, R-82-1 PageID# 1726;

11

Exhibit 20, E-82-1 PageID# 1742-43. The Letter stated that Grand was "looking to have an informal prayer group for services in my home on the Jewish Sabbath and High Holidays." *Id.* PageID# 1742-43. In the letter Grand repeatedly stated that his intention was not to have a formal synagogue, but to have an "informal prayer group on the Jewish Sabbath and High Holidays when we Jews can't drive cars." *Id.*

Separately, Brennan prepared a map of the relevant area of the City, highlighting the residences that had expressed opposition to what they had heard second or third-hand about Grand's intentions. Brennan did not indicate whether he had attempted to explain to the residents that Grand did not intend to convert his house to a synagogue, but to use a single room for the gathering of a minyan on the Sabbath and High Holidays.   At the PC meeting on March 4, 2021, Grand, represented by counsel, delivered an opening statement differentiating between Grand's intentions and a formal synagogue. MSJ-Appx. Exhibit 12, R-82-1 ("Meeting Tr.") PageID# 1684. He explained that a "shul" can be an informal space in a residential home as well as a formal synagogue. *Id.* He compared it to a "baseball field" which can be anything from "some bases out in a backyard," to a major league baseball stadium. *Id.* He analogized calling his prayer room a "HaKnesset" to calling his backyard "Grand stadium" for a game of pick-up baseball.  *Id.*

C. <u>Grand Is Subjected to An Unprecedented Quasi-Judicial Hearing</u>.

The March 4 Meeting was held via zoom and can be viewed on the City's official YouTube channel.[3] Brennan chaired the meeting and is part of the PC. Meeting Tr. PageID# 1680. The other members were Paul Siemborski, April Urban, Michael Fine, and John Rach. *Id.* McConville was present as Law Director. *Id.* At the outset of the Meeting, McConville stated "the hearing will be conducted as a quasi-judicial hearing under Chapter 2506 of the Ohio Revised Code." *Id.* PageID# 1682. This was the first time a PC meeting had ever been held in this manner. *Id.* PageID# 1715; MSJ-Appx. Exhibit 19, R-82-1 PageID# 1739. Neither Grand nor his counsel received notice of this unprecedented change in procedure or the manner in which the hearing would be conducted MSJ-Appx., Exhibit 17, R-82-1 PageID# 1763.

The quasi-judicial hearing required Grand and anyone who wished to speak to testify under oath and present their case through direct and cross examination as in a court of law. *Id.* PageID# 1681. Evidence could only be presented during a party's "case-in-chief," so that when Grand concluded his direct testimony, he was prohibited from subsequently introducing any documents. When he tried to introduce documents into the record at the end of the Meeting in response to statements of other residents or to clarify issues that appeared to cause confusion,

---

[3] https://www.youtube.com/watch?v=D5kP12aBUUY.

Brennan snapped at him, "I've rested your application, your case" and refused to allow the admission of the additional documents. *Id.* PageID# 1697. As a result, documents that Grand had twice sought to introduce were not included in the record. *Id.* PageID# 1691, 1697.

> At the end of the Meeting, PC Member Fine stated:

> The whole format that we're going through tonight is different than one we've ever used before and I've been on the planning commission for a number of years…we weren't told that we're sitting in a quasi-judicial format and there was a prosecution and defense…which itself creates a very hostile, confrontational approach of an issue.

*Id.* PageID# 1715.

> After the Meeting, Brennan issued a public statement that "the administration does not endorse or support the application," and the reason for holding the meeting as a quasi-judicial hearing was to make it more difficult for Grand to get "a second bite at the apple" by appealing to a court. MSJ-Appx. Exhibit 25, R-82-1 PageID# 1754. Brennan sought to ensure that a reviewing court would be confined to the transcript of the hearing and the documents presented to the PC, and that Grand would be precluded from presenting evidence not submitted in connection with his direct testimony. *Id.*

> After several hours of opposition testimony, PC Member Fine made a motion:

> I would then make a motion to table that the applicant come back with a more thorough presentation as to site plan with the review from the fire department, inspection of the building, what needs to be done, whether it's a realistic option from…and if he's going to ask for a special

use permit. Then it should be what the applicant has articulated, what
the applicant wants to do.

Meeting Tr. PageID# 1716. The Motion was seconded by Urban. *Id.* PageID# 1717.

Rach voted for the Motion and requested that Grand present "more drawings of the

building and the site plans so we have a clearer understanding of how the space is to

be used." *Id*. Fine's Motion passed 3-2, with Brennan and Siemborski voting against

it. *Id.*

D. Community Anti-Semitism.

After the Meeting, the PC conducted *ex parte* deliberations. MSJ-Appx.

Exhibit 19, R-82-1 PageID# 1735-40. PC Member Urban noted the "antisemitic

rhetoric and sentiment" displayed at the Meeting. She referenced an openly

antisemitic letter received by the PC prior to the Meeting stating "I am not Jewish

and I do not want our neighborhood labeled as Jewish." MSJ-Appx. Exhibit 16, R-

82-1 PageID# 1729. Urban also noted several veiled antisemitic remarks, including

repeated concerns that Grand was motivated by profit or tax exemptions, concerns

about community "change," and statements that the applicant should "move

somewhere else." MSJ-Appx. Exhibit 19, R-82-1 PageID# 1737.

The City received a letter signed "The Concerned Citizens of University

Heights" that included an online petition in opposition to Grand with 200 signatures

and another petition in opposition with 195 signatures. MSJ-Appx. Exhibit 11, R-

82-1 PageID# 1668-78; Exhibit 13, R-82-1 PageID# 1722. Brennan created and

circulated a map of the City with Grand's home shaded in blue and the homes opposed to Grand shaded in pink, intending to convey community hostility to Grand's prayer group. *Id.* PageID# 1720-21; Exhibit 14, R-82-1 PageID# 1724-25; Brennan Tr. PageID# 1606-07. The Citizen Letter and the Opposition Petition were based on obvious misinformation as to Grand's stated intentions, which Brennan did not clarify for the PC. At the end of the Meeting, one resident said, "Gross, gross. I hope you don't get reelected. I hope you don't get reelected. I hope you don't. Disgusting." Meeting Tr. PageID# 1718.

During the Meeting, Siemborski advocated to deny the application based solely on community opposition (Meeting Tr. PageID# 1717), but in the private *ex parte* deliberations Urban cautioned against dismissing based on public sentiment alone because such a course of action would "violat[e] fair housing law and would...put the city in a bad position." MSJ-Appx. Exhibit 19, R-82-1 PageID# 1737. She included a link to additional information from the DOJ and HUD as to how zoning laws relate to laws against discrimination. *Id.* PageID# 1738.

E. <u>Grand Is Denied an Opportunity to Supplement his Application.</u>

On March 11, a second PC meeting was scheduled for March 23. MSJ-Appx. Exhibit 25, R-82-1 PageID# 1754-55. On March 16, Grand emailed the PC, stating:

> As you know, the hearing has been accelerated, I have still not been provided clear requests from the city planning commission – I have yet to be put in touch with the proper personnel including the city engineer, the fire department chief, the police chief, I thought Councilman Rach

16

as an architect wanted to see the space, I really don't know what the city is expecting, and I have requested it in writing, meaning what they want me to do prior to the next meeting… This was the entire basis for the decision to table, was it not? To date, I have not been given the contact information, or a clear list of requested items, and the added acceleration makes me feel as though I should request a continuance, so that is what I am doing, if I do not have the requested information by the end of the day tomorrow, I will request a continuance.

MSJ-Appx. Exhibit 27, R-82-1 PageID# 1764-65. Rach responded that he needed floor plans and a site plan from an architect "indicating space to be used for assembly, entrance/exit, parking as applicable, setback requirements, property lines, etc." *Id.* On March 17, Brennan contradicted Rach and indicated that Grand would not be permitted to provide any additional information, notwithstanding Fine's motion to table first PC session. According to Brennan, because the PC meeting had been conducted as a quasi-judicial hearing, Grand could not submit any evidence after he had "closed his case" following his direct testimony[4]:

At the meeting of March 4, 2021, the Planning Commission tabled the matter without discussion or deliberation, even though you had closed your case as applicant. Since the meeting, individual members have expressed their desire to discuss what has been presented. This discussion is not to be done as a group outside of the confines of a public meeting.

We have called the public meeting in order to allow the Planning Commission to take the application from the table for discussion among the board members and city administration officials. Any additional testimony or additional evidence/materials for or against the application is closed for purposes this meeting. As such, there is no expectation that

---

[4] Brennan provided no support that an applicant cannot provide additional information after "resting."

you prepare or submit additional materials before or at the March 23 special meeting.

I suggest applicant be present to answer questions of commission members pertaining to applicant's previous testimony. *Notwithstanding that, neither are you expected to submit additional materials before next Tuesday's meeting, **nor will they be considered on Tuesday if you do**.* The Planning Commission may discuss whether additional materials are needed to make the decision on the merits. If such materials are deemed necessary, you will be given sufficient time to provide them.

*Id.* PageID# 1763 (emphasis added).

By precluding Grand from submitting essential evidence including a site plan and architectural designs expressly requested by the PC, Brennan not only directly contradicted Fine's motion as noted, but also effectively denied Grand's request in his March 16 email that he be "put in touch with the proper personnel including the city engineer, the fire department chief, the police chief." MSJ-Appx. Exhibit 28, PageID# 1769. Brennan ignored Grand's request to contact the police and made no independent efforts of his own to do the same, even though the police had favorable evidence for Grand in a search that showed "since 2017 we have had zero noise/disturbance complaints at 2434 Miramar, and zero parking complaints in the immediate area of 2343 Miramar." *Id.*

After being told he would not be permitted to submit additional information, Grand withdrew his application, knowing that without the information specifically

18

requested by the PC and the hostility displayed by Brennan, his application had no

chance of a favorable review.

F.  Underline: At the Second PC Meeting, the City Barred Any Activities "Consistent" with Those of a House of Worship in Private Homes.

The March 23 meeting lasted 6 minutes and is available on the City's official

YouTube Channel.[5] Brennan Deposition Extract, R-94-1 PageID# 2662-65.

Brennan, the only person who spoke at the meeting, read into the record an email

sent by Grand to the PC that day prior to the Meeting which stated:

> Mayor Brennan and Planning Commission, please be advised that I'm
> withdrawing my application for a special-use permit. I do not wish to
> operate a house of worship as is defined under the zoning ordinance, in
> the privacy of my home.

Brennan then went on to state on the record:

> I therefore note for the record that the application is withdrawn. There
> is no special-use permit for 2343 Miramar Boulevard.

However, Brennan explicitly stated that the CADO of the City, dated January 21,

2021 remained in effect, which it does to this day. Brennan did not provide any

clarification as to the application of the CADO to a small gathering in a single room.

Instead, he made a series of sweeping pronouncements collectively referred to as the

"March 23 Edict." First, Brennan declared in broad, peremptory fashion:

> Let there be no confusion, *congregating at 2343 Miramar Boulevard
> or any other address located in a residence zoned U-1 without a
> special-use permit is a violation of city law.*

_____

[5] https://www.youtube.com/watch?v=5Pl0YbrbZek&t=278s.

19

Brennan did not define the term "congregating" and did not specify that it would not apply to a small gathering of Jews to constitute a minyan on the Sabbath and High Holidays. Brennan further declared that "congregating" "weekly" to conduct activities "consistent" with those of a house a worship was prohibited without a SUP.

> I'm hopeful that the wording of the withdrawal is *not intended to suggest that congregating weekly at a residence to conduct activities consistent with those in a house of assembly does not require a special-use…*

Brennan then reiterated his edict barring "activities consistent" with those of a house of worship and called upon members of the community to "report" any violations of his sweeping order, specifically calling upon the community to monitor activities at Grand's home:

> To the community members who are here, *let there be no question, there is no permission granted here to operate…a house of assembly or conduct activities consistent with one at 2343 Miramar Boulevard. If you observe such activities,* and I hope you do not, but if you do, *you may report them to the city,* and the city will enforce its laws, which exist for the benefit of the entire community. And we will seek all appropriate remedies in court. With that I move to adjourn.

*Id.* (emphasis added).

In addition, after the second meeting, the police and other City officials and employees were instructed to monitor Grand's home for any possible violations. MSJ-Appx. Exhibit 29, R-82-1 PageID# 1772; Exhibit 30, R-82-1 PageID# 1775-76; Exhibit 31, R-82-1 PageID# 1779-80. Brennan's Edict and other actions constituted an unmistakable threat of criminal prosecution if a small number of Jews

were to "congregate" at Grand's home to form a minyan for prayer. The chilling effect on Grand's exercise of his First Amendment rights could not have been clearer.

## II.   PROCEDURAL HISTORY

Grand filed this lawsuit on September 8, 2022. R-1. Discovery was conducted until December 8, 2023. R-54. Grand filed his SAC on January 2, 2024, with claims against Defendants City, Brennan, McConville, and Siemborski. R-67 PageID# 573, 633-64. Defendants answered the SAC on January 16, 2024. R-68. Cross motions for summary judgment were filed on January 26, 2024. R-79, R-81.

On October 1, 2024, the District Court issued its decision and order dismissing all Grand's claims. R-95 ("Order"). In the Order, the Court *sua sponte* and without providing notice to or seeking briefing from the parties dismissed Grand's First Amendment, RLIUPA and discrimination claims for lack of jurisdiction based on the ripeness doctrine. Order, PageID# 2820. The Court reasoned that Grand had not been the subject of a "final" decision and therefore any actions taken by Defendants were not "ripe" for judicial review. Order, PageID# 2821-27. The Court relied heavily on Grand's withdrawal of his SUP and his statement that he did not intend to operate a house of worship subject to UHCO 1274, glossing over or ignoring the chilling effect of the CADO from the time of its issuance to the date of the first hearing, the procedural deprivations of due process that underlay Grand's

21

withdrawal of his SUP application, and the chilling effect of Brennan's March 23 Edict, which expressly targeted Grand and the type of activities "consistent" with a house of worship in which he had proposed to engage. The Court did not address Grand's facial challenges to the City's ordinances.

With respect to Grand's remaining claims, the District Court granted summary judgment for Defendants as to Count IV setting forth Grand's Fourth Amendment challenge to intrusion into his home on the basis of the alleged consent to the search granted by Grand's wife. Order, PageID# 2831-35. The Court then dismissed Count XIII on the theory that no common law right to worship exists in Ohio, *id.*, and declined to assert supplemental jurisdiction as to Count XIV alleging a violation of the Ohio Public Records Act. *Id*. The Court granted summary judgment to Count XV alleging an invasion of privacy by Brennan. *Id*.  The District Court proceeded to grant summary judgment in favor of Defendants with respect to Grand's FACE Act claim set forth in Count XVI, dismissing this count with prejudice on the grounds that Grand "unequivocally disavowed using his home as a house of worship," *Id.* PageID# 2837, ignoring persuasive authority that the statute's reference to "places" of worship includes "spaces" of worship such as specially designated rooms within a structure. The District Court also dismissed with prejudice Grand's claim for intentional infliction of emotional distress in Count XVII, Grand's claim for civil

conspiracy liability in Count XVIII and Grand's claims in Counts XIX and XX for malicious prosecution and abuse of process. Grand is not pursuing these claims.

On October 8, 2024, Grand filed a timely notice of appeal. R-97.

## ARGUMENT SUMMARY

First, the Court misapplied the "ripeness" doctrine and the related concept of "finality" in dismissing Counts I-III and V-XII. Cease and desist orders without providing for suspensive appeals prior to an administrative hearing and that do not have adequate safeguards to protect established First Amendment rights are "final" for purposes of judicial review because the harm such letters cause is direct and immediate, even if temporary. Alleged procedural due process violations are also immediately ripe because they, too, cause immediate harm at the time of their occurrence. Finally, overbroad edicts that expressly target named individuals and restrict protected First Amendment activity are subject to judicial review prior to an administrative hearing because of the immediate chilling effect of such edicts.

Second, the District Court wrongly ignored Grand's facial challenges. Counts I-III and VIII-XII against the City expressly challenged as facially invalid UHCO 1274, which applies only to "houses of worship." These challenges should have been addressed and not dismissed for lack of ripeness as facial challenges are always ripe.

Third, because of the numerous unanswered factual issues underpinning the analysis of "ripeness" and "finality," the Court erred in deciding these issues as a

matter of law, without notice and an opportunity to be heard, and without engaging in any fact finding or holding an evidentiary hearing

Fourth, the Court erred in dismissing Count IV under the Fourth Amendment because the alleged consent provided by Grand's wife was not a clear and unambiguous waiver of a known right by Grand as the property owner, and erred in dismissing Grand's FACE Act claim because contrary to the District Court's conclusions, the persuasive authority defines "places" under the Act to include "spaces" within a structure such as specially designated rooms.

Finally, because numerous claims will survive on remand, the Court should exercise its discretion to assert supplemental jurisdiction over Grand's Ohio Public Records Act claim.

## **ARGUMENT**

## I. **THE DISTRICT COURT WRONGLY APPLIED THE "RIPENESS" DOCTRINE AND THE RELATED CONCEPT OF "FINALITY."**

In applying the "ripeness" doctrine to Grand's as applied challenges, the District Court assumed that because Defendants' challenged conduct remained subject to further administrative review, the conduct was not "final" for purposes of assessing First Amendment injury. This assumption misunderstands the law. A statutory scheme that permits the prior restraint of speech without clearly articulable standards and procedural safeguards violates the First Amendment. *City of*

*Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988). Nothing in the land use context alters this bedrock First Amendment principle.

This Court reviews an order to dismiss for lack of subject matter jurisdiction *de novo. Miles Christi Religious Ord. v. Twp. of Northville*, 629 F.3d 533, 543 (6th Cir.2010)

A. <u>The Issuance of the Cease-and-Desist Order in the Absence of a Suspensive Appeals Process and Other Safeguards to Protect Core First Amendment Rights Causes Direct, Immediate Harm and Is Immediately Ripe for Judicial Review.</u>

1. <u>The Lack of a Suspensive Appeals Process.</u>

The issuance of a cease-and-desist order violates the First Amendment if it restricts protected expressive or religious activity without a compelling government interest and the use of the least restrictive means. *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 578 (6th Cir.1991) (cease-and-desist orders are a forbidden prior restraint [and] unconstitutional unless certain safeguards are present). The existence of future administrative review does not affect the constitutional analysis if the necessary safeguards are not in place because the First Amendment harm suffered is immediate and cannot be undone by future administrative action. "Even when there is the strongest reason for restraint, as in the possibility of public disorder, there must be an immediate opportunity for judicial review." *Id.* (citing *National Socialist Party of America v. Village of Skokie,* 432 U.S. 43, 44 (1977)).

In the land-use context, the protection of First Amendment interests in ripeness cases turns on the directness and immediacy of any harm to plaintiff in the absence of judicial review. Thus, in assessing whether a claim is ripe for review, courts consider three factors: "(1) the likelihood that the harm alleged by [the] plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at [this] stage in the proceedings." *Insomnia Inc. v. City of Memphis, Tennessee*, 278 F. App'x 609, 612 (6th Cir.2008). Development of a factual record, while an important consideration, is necessarily cabined by the need to ensure that no deprivation of First Amendment rights occurs pending administrative proceedings. In a related area, the Supreme Court has recently held that review of the deprivation of a constitutionally protected right is ripe upon the deprivation of the federal right, without the need to pursue state law remedies. *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 203 (2019). In overturning *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) as resting on "exceptionally ill-founded" reasoning, the Supreme Court underscored the primacy of constitutional harm considerations in ripeness analysis. In the First Amendment context, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

(1976). Ripeness analysis untethered from constitutional injury analysis subordinates Constitutional rights to local procedures in a fundamentally flawed manner evocative of the "exceptionally ill-founded" *Williamson County* reasoning.

In the cases cited by the District Court in support of its decision, the local schemes uniformly included a mechanism by which the chilling effect of a cease-and-desist order could be avoided so as to protect the plaintiff's First Amendment rights. In *Miles Christi,* 629 F.3d 533, cited repeatedly in the Order, the local scheme permitted an immediate appeal of a cease-and-desist order that *suspended the application* of the order until the relevant administrative body had concluded its review, thus counterbalancing the potentially unconstitutional effect of the order. As the Court stated in that case, "Miles Christi may potentially resolve the issue (at less expense) by appealing to the zoning board...a route *that does not require Miles Christi to cancel any Bible studies, masses or other religious activities* and a route that does not require it to pay for an engineering study *in the event* the township rejects its interpretation of the ordinances or fails to give it a variance." *Id.* at 540. Because an immediate suspensive appeals process existed, "Miles Christi, faces no jeopardy in the interim [before zoning board input], in view of the suspension of the state-law ticketing proceeding." *Id.* at 541. Similarly, in *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 351(2d Cir.2005) an appeal to the local zoning board of appeals would have stayed the cease-and-desist order at issue.

27

Defendants never suggested that any similar protective procedure exists under local law and the District Court committed clear reversible error in ruling *sua sponte* that the CADO was not "ripe" for review in the absence of any fact finding – or even questioning at oral argument – to determine whether a suspensive mechanism existed under local practice.

2. <u>The Lack of Additional Safeguards.</u>

In many cases upholding the constitutionality of cease-and-desist (or similar) orders, the orders by their terms provided additional safeguards to limit any potential constitutional harm by using the least restrictive means possible. In *Murphy*, 402 F.3d at 352, for example, the cease-and-desist order specified that a prayer gathering of fewer than twenty-five people was not subject to the order.  In *Miles Christi*, the order was crafted so as not to interfere with existing bible study gatherings pending an administrative appeal of the cease-and-desist order. *Id.* at 541. In *Yetto v. City of Jackson*, No. 117CV01205STAJAY, 2019 WL 2715545, at *3 (W.D.Tenn. June 28, 2019), also relied on heavily by the District Court in its Order, a specific procedure prevented community complaints from triggering a restraint of constitutionally protected activity. As the Court described the procedure:

> When the Planning Department receives a complaint about a possible zoning violation, a form letter is sent to the property owner on whose property the violation allegedly occurred. If the property owner responds and denies the alleged violation, no further action is taken, unless the Planning Department receives another complaint or receives other information showing a violation.

*Yetto*, 2019 WL 2715545, at *3.

In Grand's case, the CADO was issued immediately upon receipt of a single neighbor-complaint and before any religious activity occurred. MSJ-Appx., Exhibit 3, R-82-1 PageID# 1553; Brennan Tr. PageID# 1583-85, 1588. Far from permitting certain uses of his home with a numeric limitation on the number of participants, as in *Murphy*, or providing Grand with an opportunity to deny the complaint and continue the proposed activity, as in *Yetto,* Defendants immediately issued the sweeping CADO. Grand's only option to avoid running afoul of the order was to cancel his proposed prayer gathering, thus suffering direct and immediate constitutional injury clearly redressable by court action. Grand repeatedly made it clear to Brennan that he was only dedicating a single room of his house to the prayer gathering, only non-driving Orthodox Jews would attend, only 12 people had been invited, and he was only aiming to assemble a "minyan" of ten Jews to pray in his home. Brennan Tr. PageID# 1589; MSJ-Appx, Exhibit 8, PageID# 1638-40; Exhibit 20, PageID# 1742.

Arguably, the instruction to apply for a SUP was the Defendants' way of instructing Grand how to appeal. If so, the appeal process perpetuated an infringement of First Amendment rights for the almost six weeks it took for Grand to obtain a hearing. During this period, Grand reasonably believed that any prayer gathering in his home was absolutely prohibited and would subject him to criminal

penalties, thus impermissibly restricting Grand's free exercise of his religion. At the very least, the factual record is incomplete because the Court dismissed Grand's claims *sua sponte* without developing the facts around the effect of cease-and-desist orders in City land-use context.

B. <u>The Alleged Violations of Procedural Due Process in the Conduct of the PC Hearing Are Immediately Ripe for Review</u>.

It is settled that procedural due process claims separate from the violation of an underlying constitutional right are immediately ripe for review. *Bigelow v. Michigan Dep't of Nat. Res.*, 970 F.2d 154, 159 (6th Cir.1992) (in the context of a procedural due process claim, "the allegedly infirm process is an injury in itself") (quoting *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991). As the Court clarified in *Bigelow*:

> Therefore, notwithstanding its broad language, *Nasierowski* appears to stand merely for the sensible proposition that while different circumstances may produce different results, the final decision rule does not apply when the denial of procedural due process itself creates an injury.

*Bigelow*, 970 F.2d at 160.

Here, Grand identified numerous procedural due process violations that created direct harm and are immediately reviewable. First, Defendnts deliberately organized the SUP hearing as a quasi-judicial adversarial hearing with opening statements, direct and cross-examination, and the resting of a party's case after direct examination (precluding further evidentiary submissions). Meeting Tr. PageID#

1715. Obviously, an adversarial hearing, like a trial, requires a different kind of preparation than a more open-ended presentation with a free-wheeling back and forth. Defendants used the quasi-judicial format to force Grand to "rest" his case after his direct examination, even though several members of the PC expressly requested the production of additional information after Brennan determined Grand had "rested" his case. Thus, even though the SUP hearing did not result in a final decision as such, the process resulted in a denial of Grand's rights. Indeed, even though the SUP hearing was adjourned on the motion of a PC member who requested the submission of additional information. Meeting Tr. PageID# 1716. Brennan enforced the "closing of the record" interpretation of the "quasi-judicial" SUP hearing by telling Grand that additional information responsive to the PC's concerns would not be considered at the second PC hearing. MSJ-Appx. Exhibit 27, R-82-1 PageID# 1763-65.

Second, Brennan deliberately organized the hearing in a one-sided manner friendly to Grand's opponents. Brennan prepared and distributed a map of the relevant portion of the City displaying the opposition to Grand's application, which was unfairly and inaccurately described to the neighbors as involving the establishment of a full-blown synagogue. MSJ-Appx., Exhibit 9, R-82-1 PageID# 1642. Moreover, when members of the public expressed openly anti-semitic views, Brennan and McConville remained conspicuously silent, implicitly condoning the

31

offensive statements. MSJ-Appx., Exhibit 19, R-82-1 PageID# 1737-38. The foregoing actions violated procedural due process and are immediately reviewable because they caused immediate harm. _Nasierowski_, 949 at 895 (6th Cir.1991) (act that in and of itself causes injury is immediately reviewable even before a final decision on the merits); _AM Rodriguez Assocs., Inc. v. City Council of Vill. of Douglas_, No. 1:08-CV-214, 2009 WL 4353684, at *5 (W.D.Mich. Nov. 30, 2009) (holding claims to be ripe where "procedural due process injury arises from the alleged unfairness in the public hearings, not the outcome of those hearings" and plaintiff alleged "the quintessential procedural due process claim—the denial of a fair hearing") (citing _Withrow v. Larkin,_ 421 U.S. 35, 46 (1975) (basic requirement of procedural due process is a "fair trial in a fair tribunal")).

Third, Grand's due process claims are "conceptually distinct" from his substantive claims. _See JGA Dev., LLC v. Charter Twp. of Fenton_, No. CIV. 05-70984, 2006 WL 618881, at *6 (E.D.Mich. Mar. 9, 2006). The unfairness of the process led Grand to withdraw his application. Grand Deposition Transcript, R-80 PageID# 1261 ("At that moment I didn't feel like the permit process I was going through and enduring was fair at all."). He suffered the Hobson's choice of convening a prayer minyan in his home and facing criminal penalties, or foregoing the exercise of his First Amendment right to free exercise of his religion—regardless of any final administrative or legislative action clarifying the precise scope of UHCO

1274. The injury resulting from the unfairness of the quasi-judicial hearing was direct and concrete, and created immediate harm, thus becoming immediately ripe for review.

C. Brennan's March 23 Edict Was Clearly Unconstitutional.

At the conclusion of the second PC hearing, Brennan declared, "let there be no mistake, activities consistent with a house of worship are not permitted and will not be tolerated." This Edict was unconstitutionally vague and overbroad on its face and inflicted immediate harm on Grand. But even if the Court were to find that the Edict itself could be construed in a constitutional manner, it was applied unconstitutionally. In applying the Edict, Brennan ordered surveillance of Grand's property and encouraged Grand's neighbors to spy on and report if they perceived conduct like that conducted in a house of worship. Brennan Deposition Extract, R-94-1 PageID# 2662-65; MSJ-Appx. Exhibit 29, R-82-1 PageID# 1772; Exhibit 30, R-82-1 PageID# 1775-76; Exhibit 31, R-82-1 PageID# 1779-80. Brennan effectively delegated application of the Edict to a community he knew was animated by bias and anti-semitism against Grand, thus virtually guaranteeing its unconstitutional application—and causing Grand to forego his plans rather than risk community action that could result in criminal penalties.

Praying, singing hymns or carols, receiving or blessing the Eucharist (including to a person dying of cancer), giving a sermon, reading scripture—these

33

are all activities "consistent" with those of a house of worship and all would be, *a priori*, barred by the plain language of Brennan's edict. One would be hard pressed to think of a clearer infringement on constitutional liberties than calling upon citizens to police religious activity without clear standards.

D.  <u>Grand's Discrimination Claims Come Within the Futility Exception to the Ripeness Doctrine</u>.

Grand made three separate discrimination claims: Count VI and X allege he was discriminated on the basis of religion in violation of the Fourteenth Amendment and RLUIPA's nondiscrimination provision, and Count VII alleges he was discriminated against as a class of one.

The District Court did not address the allegations of anti-semitism at all, and instead summarily dismissed Grand's three discrimination claims because of lack of finality. However, as with Grand's procedural due process claims, Grand's discrimination claims matured as soon as he was subjected to ethnically-based discrimination that convinced him he had no choice but to withdraw his application because any further proceedings before a body that countenanced discrimination would be futile. When Grand observed the blatant anti-semitism that was tolerated at the first PC meeting, he knew he could not get a fair hearing. Grand Deposition Tr. R-80 PageID# 1261. Hundreds of community members mobilized in opposition before he hosted a single prayer assembly. One of them went so far as to base her objection on the fear that the neighborhood would be "labeled Jewish." MSJ-Appx.

34

Exhibit 16, R-82-1 PageID# 1729. PC member Urban noted the "anti-semitic" and "problematic community rhetoric." MSJ-Appx. Exhibit 19, R-82-1 PageID# 1737-38. One resident said she had "suspicions" about Grand because he invited her for the Sabbath. Meeting Tr. PageID# 1703. Several residents stated that if Grand wished to walk to synagogue, he should have purchased a house in a different neighborhood, implying that the neighborhood was not welcoming for Orthodox Jews. *See, e.g., Id.* PageID# 1710, 1711. One resident prefaced her opposition by volunteering that she has "friends that are Jewish," a cliché that often precedes bigoted statements about Jews.[6] *Id.* PageID# 1703. Defendants condoned this blatant anti-semitism.

Grand was effectively put on trial in front of his neighbors at a public, unprecedentedly "hostile and confrontational" hearing. He was "subject[ed]…to the humiliation of explicit and certain rejection," *Teamsters v. United States*, 431 U.S. 324, 367-68 (1977), as well as a torrent of "problematic community rhetoric," including open "antisemitism" simply because he wanted to host a small informal Jewish prayer assembly at his home on the Sabbath when Orthodox Jews like Grand and his prospective invitees are not allowed to drive. The Government officials took no action to restrain or prevent community antisemitism, or even to admonish those

---

[6] https://www.nbcnews.com/news/us-news/ye-appears-to-makes-offensive-comments-jewish-community-praises-hitler-rcna191150; https://www.youtube.com/watch?v=9iLr_N_Xs8w.

who expressed openly antisemitic comments that such comments have no place in America and would not be tolerated or taken into consideration.

Grand's discrimination claims are not barred by ripeness for the same reason that a potential job applicant need not apply for a job if "a consistently enforced discriminatory policy deters job applications from minorities because they are unwilling to subject themselves to the humiliation of explicit and certain rejection." *Payne v. Bobbie Brooks, Inc.*, 505 F. Supp. 707, 716 (N.D. Ohio 1980), *aff'd*, 701 F.2d 180 (6th Cir.1982) (citing *Teamsters*, 431 U.S. at 367-68) In this circumstance, filing a job application would be futile, just as Grand knew it would be futile to pursue his application before a PC that had tolerated, even condoned, antisemitism and animus against him. *See BMG Monroe I, LLC v. Vill. of Monroe*, 93 F.4th 595, 601 (2d Cir.2024) (under futility exception, applicant is excused from obtaining a final decision if pursuing further action would be futile because a zoning agency has "dug in its heels" and made clear that any future applications will be denied).

The District Court completely failed to address the issue of futility, and its ripeness analysis is thus fatally flawed. *See, e.g.*, *Allen v. Keanen*, No. 13-CV-718, 2019 WL 1486679, at *3 (W.D.N.Y. Apr. 4, 2019) (futility of filing grievances would preclude summary judgment and require an evidentiary hearing); *Norman v. United States*, 38 Fed. Cl. 417, 429 (1997) (concluding that disputed issues of fact surrounding issue of futility require rejecting ripeness defense at summary judgment

36

stage). The District Court's ruling on Grand's discrimination claims should be remanded for a trial on the question of futility or, at an absolute minimum, for further briefing before Grand's claims are dismissed with prejudice.

## II.   THE DISTRICT COURT WRONGLY IGNORED GRAND'S FACIAL CHALLENGES TO THE CITY'S ORDINANCES.

A. Grand Stated and Argued Facial Challenges

Contrary to the assertion of the District Court that Grand had not made facial challenges, Grand's SAC contains an entire section of 8 full pages consisting of almost 60 numbered paragraphs dedicated exclusively to the facial challenges to UHCO 1274. SAC, R-67 PageID# 616-23. The section begins with the bold and underlined heading:

> University Heights codified ordinances, *on their face* and as applied, violate the United States Constitution, the Ohio Constitution, and RLUIPA, and Ohio Common Law.

*Id.* PageID# 616 (emphasis added). These 60 paragraphs are incorporated into all counts. Count III alleges:

> The UHCO contains no articulated standards with respect to review by City Council of an application for a SUP for a house of worship in a residential zone … and, as such, are an unconstitutional prior restraint on Plaintiff's protected religious expression and exercise under the First Amendment. The lack of articulated standards unconstitutionally provides the City Council and the Planning Commission with unbridled discretion in its review of such applications for a house of worship.

*Id.* PageID# 633-34.

Several counts contain common language for facial challenges such as "imposing and implementing land use regulations" in an unlawful manner. *Id.* PageID# 635-37. Included in Grand's prayer for relief are two requests for declarations that "the City's land use ordinances…are void, invalid, and unconstitutional on their face on the ground that they violate" the First Amendment, RLUIPA, and the Ohio Constitution. *Id.* PageID# 640. The District Court acknowledged that Grand requested "a declaration that the City's land-use ordinances are unconstitutional because they violate the First Amendment, RLUIPA, and the Ohio Constitution," but omitted the words "on their face." Order, R-95 PageID# 2817.

In addition to the copious assertions of the facial challenges, Grand argued facial challenges in each of his briefs for summary judgment. *See, e.g.,* R-81 PageID# 1360 ("UHCO 1274 violates this on its face."); PageID# 1361 ("These requirements, on their face, unreasonably limit places of religious assembly in the City."). In his Opposition to Defendants' Summary Judgment Motion, he stated three times that **"UHCO 1274.01 discriminates on its face between religious and non-religious activity and is not neutral."** R-89 PageID# 2521, 2523, 2533. He also did so in his Reply. R-91 PageID# 2601 ("UHCO 1274.01(b)(1) thus on its face plainly restricts practices because of their religious nature"); PageID# 2607 (same). The

District Court's assertion that Grand did not plead or argue a facial challenge is simply wrong.

B. Grand's Facial Challenges are Ripe.

Facial challenges to land use regulations and other laws are ripe the moment the challenged regulation or ordinance is passed. *Hill v. Snyder*, 878 F.3d 193, 214 (6th Cir.2017); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 399 (6th Cir.2001); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997). *See also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 595 (S.D.N.Y.2013), *aff'd sub nom.*, 945 F.3d 83 (2d Cir.2019) (collecting cases).

Facial challenges become ripe immediately because the constitutional harm occurs as soon as the regulations restricting constitutionally protected activity take effect and "inflict constitutional harm no matter how they are applied to individuals." *Hill,* 878 F.3d at 214. In *Knick v. Twp. of Scott*, 588 U.S. 180 (2019), the Supreme Court overruled precedent requiring a property owner to file an inverse condemnation action in state court before filing a federal lawsuit facially challenging a regulation under Section 1983. The Court explained that the availability of a remedy in state court does not retroactively erase the harm that occurred at the time the regulation is passed. *Id.* at 191 ("The availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or

restrict the property owner's federal constitutional claim—just as the existence of a state action for battery does not bar a Fourth Amendment claim of excessive force."). The passing of an unconstitutional law inflicts constitutional harm immediately on those bound by the law, and therefore facial challenges to the law are immediately ripe for review.

When evaluating the ripeness of a facial challenge, the Supreme Court has set forth a two-prong evaluation for addressing ripeness that contains both an Article III consideration and a prudential concern: A claim is ripe where it is "fit for judicial decision" and where "withholding court consideration" will cause hardship to the parties. *Hill*, 878 F.3d at 213.

With respect to the first prong, UHCO 1274 facially prohibits residents from operating a "house of worship" without obtaining a SUP. PageID #1782-87. The Ordinance does not define "house of worship," making it impossible for a person of ordinary intelligence to understand what is prohibited so that they may act accordingly. *Grayned v. City of Rockford,* 408 U.S. 104, 109 (1972) (in the First Amendment context "uncertain meanings inevitably lead citizens to 'stead far wider of the unlawful zone … than if the boundaries of the forbidden areas were clearly marked."). On its face, the Ordinance chills a person of ordinary intelligence from organizing a regular assembly for prayer in his home without a SUP for fear of violating the City's laws. The fact that the SUP process is available to a resident who

wants to organize a prayer assembly does not erase the violation of rights or deprive him of a federal claim. *Knick*, 588 U.S. at 191.

Grand expressly alleges that UHCO 1274 is facially invalid, and he set forth a detailed analysis of the Ordinance's provisions in support of the allegation. SAC R-67 PageID# 616-623. Grand's facial challenges do not turn on Grand's particular SUP application or any other facts. Instead, the SAC alleges several textual deficiencies that render the Ordinance unconstitutional on its face, regardless of the factual specifics of the application.

First, Grand alleges the Ordinance "lacks any reasonable time limits for which City Council must render a decision." *Id.* PageID# 619. Pursuant to UHCO Section 1274.01(d)(2) and (3), an applicant who applies for a SUP to operate a "house of worship," must first obtain a "recommendation" from the PC. But even if the applicant obtains the recommendation, it is "subject to the approval of a majority of [City] Council" and only by obtaining such approval can the applicant obtain a certificate of occupancy. *Id.* PageID# 1783. If the PC denies his application, there is a timeframe by which he must file an appeal and by which the City must hear the appeal. But if the PC *grants* its recommendation, the City Council has the unbridled discretion to withhold its final approval indefinitely, with no specified deadline by which it must render a decision. This deficiency alone renders the Ordinance invalid. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 226-27 (1990).

Additionally, the SAC alleges:

> UHCO Chapter 1274 provides no standard that the City Council must adhere to when considering whether to grant approval for an application for a SUP for a house of worship, accordingly, City Council, which is the City's elective legislative body, has unbridled discretion in approving or denying a SUP for a house. The Ordinance allows the PC and City Council to take into account an applicant's personality, race, religion, and/or other traits unrelated to land use when considering whether to grant or deny a SUP for a house of worship, and to deny an application simply because the governing body finds that the applicant lacks likability, charisma, or spirituality.

PageID# 616-17.

Counts I and II allege that the Ordinance's facial grant of unbridled discretion to an elected body, deprived and continues to deprive Grand of his rights to exercise his religion and assemble without a compelling government interest and without using the least restrictive means in violation of the First Amendment. PageID# 633. Count III alleges that the Ordinance, on its face, "contains no articulated standards with respect to review by City Council of an application for a SUP for a house of worship in a residential zone…and, as such, are an unconstitutional prior restraint on Plaintiff's protected religious expression and exercise under the First Amendment. The lack of articulated standards unconstitutionally provides the City Council and PC with unbridled discretion in its review of such applications for a house of worship." *Id.* Counts VIII-XII similarly allege that the Ordinance violates various RLUIPA provisions and Ohio's Constitution. PageID# 635-37.

UHCO 1274 is not facially neutral for purposes of Free Exercise analysis because it expressly prohibits conduct undertaken for religious reasons. *Church of Lukumi Babalu Aye Inc. v. City of Hialeah,* 508 U.S. 520, 532 (1993). "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id.*, at 533. If the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral. *Id.* "Government fails to act neutrally when it…restricts practices because of their religious nature." *Fulton v. City of Philadelphia,* 593 U.S. 522, 533 (2021). Moreover, UHCO 1274 is not neutral or generally applicable because it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* (quoting *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 884 (1990)). The SUP application process contains a mechanism for individualized exemptions, and it provides the Defendants with unbridled discretion to regulate even small gatherings for religious purposes.

UHCO 1274, on its face, invites the City to consider particular reasons and conditions because it does not define any of its key terms. The regulated uses listed in UHCO 1274.01(b) are "house of worship," "religious education," "churches," "temples," "synagogues," "religious organizations," "parish houses" and "parochial schools." Most if not all of these terms do not have a clear or obvious meaning and

cannot be assessed without the particularized analysis that prevents facial "neutrality" under *Fulton*. The only commonality is that they are all associated with religious use as opposed to secular use. When does "education" become "religious" so that it requires a SUP? When does a private prayer group become a synagogue? Does a daily prayer group of ten Jews in a home transform the residence into a "synagogue"? Does the mere use of the word "synagogue" suffice to make places designated by these words subject to land use regulation? The use of the word "shul"? These determinations are all left for the Defendants to make on an individualized basis. Moreover, UHCO 1274 incorporates a system of individual exemptions in the form of variances to its various specific restrictions on religious activity. This system of discretionary exemptions clearly shows that UHCO 1274 is not a neutral law of general application. *Fulton,* 593 U.S. at 533. UHCO 1274 is not neutral or generally applicable by any standard because on its face it regulates religious activity.

With respect to the second prong of the analysis, Grand will suffer hardship absent judicial consideration of his claims because Grand remains subject to UHCO 1274 and cannot freely exercise his religion by assembling in his home to pray. Contrary to the Court's assertion, there was never any "agreement" among the parties that Grand could use the room in question in his home for private prayer gatherings. On the contrary, Brennan went out of his way to target Grand in the

March 23 Edict, and called on the community to spy on Grand and report any activities consistent with those of a house of worship (*e.g.* observing a few men with prayer shawls entering Grand's residence).

Defendants' assertion in their briefing that the City accepts "small and informal religious gatherings" lacks any evidentiary support. But even taking Defendants' briefing at face value, Defendants' assertion does not reflect a definite agreement. How many people constitute a "small" religious gathering, and at what point does it become "large?" Are more than 10 people permitted? When does a "gathering" cease to be "informal?" Does a name for the group make it formal? Does the presence of a rabbi make it formal? And what is a "regular basis?" Can the group meet once a month? Once a week? Daily? These questions remain unanswered and require judicial consideration. Moreover, the record shows that the CADO is still in effect, and Grand has no guidance as to what is permitted under the law absent judicial consideration.

Grand expressly asserts facial challenges and his standing to challenge the Ordinance has never been in dispute. The facial challenges are ripe and the District Court should have addressed them on the merits, but instead, declined to do so, stating incorrectly in a footnote that Grand did not "state" or "argue" a facial challenge, when in fact he clearly did both. This Court should reverse the dismissal

of the facial claims against the City and should remand them to the District Court with instructions to decide them on the merits.

C. <u>The parties never agreed that the ordinance does not apply</u>.

As noted, the District Court's finding that the parties "agreed" that the Ordinance did not apply was clearly erroneous. Grand insisted from the outset that the Ordinance did not apply, but the City insisted from the January 21 CADO to the March 23 Edict that Grand's proposed private "shul" or limited prayer group gathering violated UHCO 1274 and would be met with prosecution and penalties if Grand carried out his proposal. Certain PC members in private *ex parte* deliberations, notably Fine and Urban, suggested that Grand's proposed gathering may not violate UHCO 1274, but Brennan, speaking for the City and the PC, consistently, repeatedly and publicly rejected any such view.

When Grand withdrew his application with the statement that he did not wish to open a "house of worship" there was obviously no "agreement" with the PC or the City, since Brennan went out of his way ("Let there be no mistake") to underscore that what Grand had proposed–conducting activities "consistent" with those in a house of worship–was not permitted and would not be tolerated. This was the opposite of an "agreement."

The District Court cited to no evidence of any agreement, but only to an alleged unilateral "stipulation" in Defendants' summary judgment papers.

> Defendants, in their summary judgment papers, have stipulated that Grand, and anyone else in the City, can hold small, informal religious (or non-religious) gatherings on a regular basis and such activity is not subject to any of the City's ordinances or permitting requirements. (Doc. 88 at 2419–20.)

Order, PageID# 2818.

However, there is no such "stipulation" anywhere to be found in the record. R-88 PageID# 2419-20. Arguments in a brief are not "facts," and the District Court committed clear error in treating an assertion in a brief as a fact. *Cf. Amy Lou G., v. Commissioner of Social Security,* 2025 WL 606459 (S.D. Ohio, Feb. 25, 2025). At a minimum, Defendants' factually unsupported assertion should have been probed during oral argument or at a hearing. The Court would have learned there was no such "stipulation" and Defendants' argument could not magically conjure one up in their briefing. But even if Defendants had stipulated, after years of litigation, that a limited prayer group does not constitute a house of worship even if it is denominated a "shul," this would only concede Grand's point: for the years until this concession was made, the policy of the City, as articulated in the CADO and Brennan's March 23 Edict denied Grand the right to exercise his First Amendment rights by organizing a regular prayer gathering in a single room in his home referred to as a "shul." Defendants' concession that they were wrong in sending Grand a CADO would not "eliminate Grand's facial challenge altogether" as the District Court asserts. PageID# 2826. On the contrary, it would support the facial challenge as it

underscores the unconstitutional vagueness and substantial overbreadth of the Ordinance.

*Yetto*, cited by the Court in support of its conclusion, did not dismiss a facial challenge to an ordinance based on a purported "agreement" of the parties. In *Yetto,* the plaintiffs brought facial and as-applied claims under the First Amendment and RLUIPA. The First Amendment claims were barred by the statute of limitations, but the RLUIPA claims were *not* dismissed and survived summary judgment, going to trial "because there were disputed issues of material fact." *Id.* at *1. Moreover, early in the litigation the plaintiffs were granted a preliminary injunction. *Id.* at *1 n.1. After a bench trial, the court found for the plaintiffs that the zoning ordinance did "not apply to the type of gathering being held at the Yettos' residence on the date that" the defendants sent a cease-and-desist letter. *Id.* at *6. The Court issued a permanent injunction against the defendants and awarded the plaintiffs' attorneys' fees as the prevailing party. *Id.* at *7, 10. Plaintiffs argued *at trial* that if the court found for the defendants that the zoning ordinance did apply, then the court should find the zoning ordinance facially invalid in violation of RLUIPA. *Id.* at *7. However, "because the court [after trial] found that the gatherings do not fall within that definition," Plaintiffs' facial challenge to the Zoning Ordinance" failed. *Id.* The procedural posture of *Yetto* either supports Grand's view that he was entitled to

summary judgment as a matter of law, or rebuts Defendant's position that there were no genuine issue of material fact to be tried.

### III.    THE DISTRICT COURT WRONGLY DISMISSED GRAND'S CLAIMS WITH PREJUDICE SUA SPONTE WITHOUT NOTICE OR A CHANCE TO BE HEARD.

A district court faced with a complaint which it believes may be subject to dismissal must notify all parties of its intent to dismiss the complaint and give the plaintiff a chance to either amend his complaint or respond to the reasons stated by the district court in its notice of intended *sua sponte* dismissal.  *Benson v. O'Brian*, 179 F.3d 1014, 1015–16 (6th Cir.1999).

> The District Court justified its decision in a footnote.

> Defendants raise ripeness in their opposition to Grand's motion for partial summary judgment, but only as to procedural due process (Count Five). Because the doctrine applies to all claims arising from a land-use dispute, and because it goes to whether the Court has subject matter jurisdiction, the Court considers ripeness *sua sponte* for all land-use related claims at issue here. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (a court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

Order, PageID# 2820.

*Arbaugh* does not support the proposition that a district court may *sua sponte* dismiss a complaint with prejudice without notice or an opportunity to be heard. There, the defendant, not the court, raised the jurisdictional issue by filing a motion under Federal Rule 12(h)(3). *Id.* at 508. Though a court has an obligation to determine subject matter jurisdiction, nothing in *Arbaugh* suggests that the court

may *sua sponte* dismiss the case with prejudice without giving a party notice or an opportunity to be heard, particularly where there are critical factual issues that are embedded in the application of the ripeness doctrine. Most notably, the record does not indicate whether Grand could have appealed and stayed the application of the CADO pending a formal review of his SUP application, a critical consideration in Grand's as applied challenge. *Supra* Section I.A.1 (citing *Miles Christie* and *Murphy*). The Court did not seek briefing or clarification on this issue and, at a minimum, should have conducted a fact-finding hearing before concluding that the challenge to the CADO was not "ripe" for review.

### IV.    THE DISTRICT COURT WRONGLY DISMISSED PLAINTIFF'S FOURTH AMENDMENT AND FACE ACT CLAIMS.

A. <u>Fourth Amendment</u>.

The District Court relied solely on an interpretation of Mrs. Grand's alleged consent in her deposition to determine whether Mr. Grand had consented a search of his home. Order, PageID# 2830-31. This is as illogical as it is wrong. Consent is defined as "capable, deliberate, and voluntary agreement to or concurrence in some act or purpose implying mental power and free action." *United States v. Hollern*, 366 F. App'x 609, 612 (6th Cir.2010). The record does not contain any evidence that Mrs. Grand had the capacity to consent on behalf of her husband. Moreover, consent is quintessentially a question of fact for the jury, not a matter for the judge to decide

as a matter of law. *See Carpenter v. Bowling*, 276 F. App'x 423, 425 (6th Cir.2008); *Oliver v. Reynolds*, No. 5:06-CV-1-R, 2007 WL 2155688, at *4 (W.D.Ky. July 25, 2007).

B. FACE Act

!    As to the FACE Act, the District Court reasoned that because Grand consistently maintained that he did not aim to use his home primarily as a house of worship, he could not maintain a FACE Act claim predicated on threats barring entry to his home. Order, PageID# 2835-37. The District Court once again misreads applicable precedent. The District Court says that it finds the holding in *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir.2021) persuasive. Order, PageID# 2837. But the Second Circuit's holding in *Jinrong* was not that a "home" had to be recognized as primarily devoted to religious worship activity, but that the statutory phrase "place" of religious worship was any "space" devoted primarily to religious worship. This could be a café or a classroom or any other "area" primarily set aside for regular religious worship. As the Court stated:

> Accordingly, we cannot interpret "a place of religious worship" as imposing any particular conceptual, physical, or temporal requirements. "Places of religious worship" may be fixed or moveable, enduring or temporary, *bounded within a structure* or structureless. But the basic feature of "a place of religious worship," as understood by Congress, is that religious adherents collectively recognize or religious leadership designates the place as one primarily for religious worship.

*Jingrong*, 16 F.4th at 59 (emphasis added).

!

51

Grand did not need to establish that he intended his _entire home_ to be a place of worship—obviously that was not his intention. He needed only to establish that _a space within_ his home, _i.e._, the prayer room at issue in this litigation, was intended to be primarily dedicated to religious worship. There is no dispute that Grand intended his prayer room to be devoted primarily to regular religious worship, as he had fitted out the room with the tables and chairs needed for "davening" and Torah study. MSJ-Appx., Exhibit 8, R-82-1 PageID# 1638-40. The District Court leapt illogically from the _Jinrong_ court's careful gloss on the word "place" as a "space" to the entire structure of Grand's home, which the _Jinrong_ court expressly rejected as the basis as the meaning of a "place" (_see supra_, including in place of worship, a place "_bounded within a structure_," and expressly finding that an individual room could be a "place" of worship, provided it was primarily devoted to religious worship, as Grand's prayer room was intended to be).

The District Court's misreading of the FACE Act statute and the primary case cited interpreting the act would render the FACE Act inapplicable to houses of worship or reproductive health providers that are housed within a larger facility-which is obviously not the statute's intent.  Accordingly, its decision on Count XVI must therefore be reversed and remanded.

## V. THE DISTRICT COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S OHIO PUBLIC RECORDS ACT CLAIMS.

On remand, the District Court should be encouraged to exercise supplemental jurisdiction over Plaintiff's Ohio Public Records Act claim, as this claim shares a "common nucleus of operative fact" with other claims that will clearly survive. *Hunter v. Mendoza*, 197 F. Supp. 2d 964, 972 (N.D. Ohio 2002). For example, evidence of surveillance and threatening activity was sought in Grand's Open Records Act, and the City's alleged failure to comply with its Open Records Act obligations bear on the City's animus against Grand for purpose of his discrimination claims and its conduct in violation of the FACE Act.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court dismissing Plaintiff's claims I-III, V-XII and XVI should be reversed. Summary judgment on Grand's facial claims should be entered in his favor, and the remaining claims should be permitted to proceed to trial.

Dated: March 24, 2025                    Respectfully submitted

/s/ Eden Quainton                        /s/ Jonathan Gross
Eden Quainton, *admission pending*       Jonathan Gross, *admitted*
Quainton Law, PLLC                       Law Office of Jonathan Gross
2 Park Avenue, 20th Floor                2833 Smith Ave., Suite 331
New York, NY 10016                       Baltimore, MD 21209
(212) 419-0575                           (443) 413-0141
eden.quainton@quaintonlaw.net            jonathansgross@gmail.com
*Counsel for Plaintiff-Appellant*        *Counsel for Plaintiff-Appellant*

53

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), Plaintiff-Appellant Daniel Grand hereby certifies that this brief complies with the type-volume limitation in Rule 32(a)(7)(B) because, as counted by the Microsoft Word word count tool, this brief contains 12,946 words, excluding the parts exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirements in Rule 32(a)(5)(A) and the type-style requirements in Rule 32(a)(6) because this brief has been prepared in proportionally spaced 14-point Times New Roman font. Dated: March 24, 2025

/s/ Jonathan Gross

## CERTIFICATE OF SERVICE

On the 24th day of March, 2025, I filed the foregoing document electronically and it is available for viewing and downloading from the ECF system. Service was accomplished by means of Notice of Electronic Filing upon all parties.

/s/ Jonathan Gross

## APPELLANTS DESIGNATION OF RELEVANT
## DISRICT COURT DOCUMENTS

| Record entry | Date | Description |
|---|---|---|
| 1 | 9/8/2022 | Original Complaint |
| 54 | 11/17/2023 | Opinion and Order extending discovery deadline |
| 67 | 1/2/2024 | Second Amended Complaint |
| 68 | 1/16/2024 | Answer to Second Amended Complaint |
| 78 | 1/26/2024 | Deposition of Rakhel Davidoff taken on December 6, 2023 |
| 79 | 1/26/2024 | Defendants' Motion for Summary Judgment |
| 80 | 1/26/2024 | Deposition of Daniel Grand taken on November 2, 2023 |
| 81 | 1/26/2024 | Plaintiff's Motion for Partial Summary Judgment |
| 82-1 | 1/27/2024 | Plaintiff's Appendix of Exhibits for Motion for Summary Judgment |
| 88 | 2/26/2024 | Defendants' Response to Plaintiff's Motion for Partial Summary Judgment |
| 89 | 2/26/2024 | Brief in Opposition to Defendants' Motion for Summary Judgment |
| 90 | 3/11/2024 | Defendants' Reply in Support to Motion for Summary Judgment |
| 91 | 3/11/2024 | Plaintif's Reply in Support to Motion for Partial Summary Judgment |
| 91-1 | 3/11/2024 | Declaration of Daniel Grand, March 8, 2024 |
| 91-3 | 3/11/2024 | Declaration of Rabbi Aharon Rosskamm, March 11, 2024 |
| 91-4 | 3/11/2024 | Excerpts from Brennan Deposition |
| 95 | 10/1/2024 | Amended Memorandum Opinion and Order. Judge Bridget Meehan Brennan |
| 96 | 10/1/2024 | Amended Judgment Entry: Judge Bridget Meehan Brennan |
| 97 | 10/8/2024 | Notice of Appeal to the Sixth Circuit Court of Appeals |